Jesus RAMIREZ; Arturo Garcia; Guillermina Garcia; Jose Garcia; Arturo Garcia, Jr.; Juan Rodriguez; Jose Jimenez; Raul Ramos; Jesus Mendoza; Tomas Valentin; Gregoria Guerrero; Zenaida Quinones; Janet Quinones; Awilda Quinones; Nelson Santiago; Cynthia McCleary; Martin Ramos; Domingo Coriano; Benedicto Padron; Timothy Ponce; Juan Guerrero, Jose Guerrero, Maria Guerrero, and Margarita Guerrero by their next friend, Gregoria Guerrero; Norma Garcia, Lupita Garcia, and Enedina Garcia by their next friend, Arturo Garcia; and Jose Angel Garza by his next friend Gregoria Guerrero; individually and on behalf of all others similarly situated, Alfredo Solis; Joe Manuel Solis by his next friend Alfredo Solis; Alvaro Aguilar and Nancy Aguilar, Plaintiffs,

v.

Jack E. WEBB and Gregory Kowalski, both individually and in their official capacity as agents of the Immigration and Naturalization Service; Paul E. McKinnon, both individually and in his official capacity as District Director of the Immigration and Naturalization Service; Jerald D. Jondall, both individually and in his official capacity as District Director of the United States Border Patrol; Ronald Dowdy and Edwin W. Earl, both individually and in their official capacity as agents of the United States Border Patrol; John Doe I through XXXXIV, both individually and in their official capacity as agents of the Immigration and Naturalization Service of the United States Border Patrol; Unknown Local Law Enforcement Agencies; Ronald Roe I and II, both individually and in their official capacity as agents of Unknown Local Law Enforcement Agencies, Defendants.

No. K 81-344.

United States District Court,
W.D. Michigan.

Dec. 10, 1984.

Gary Gershon, Grand Rapids, Mich., Philip R. Riley, Berrien Springs, Mich., Edward Preston, East Lansing, Mich., for plaintiffs.

Anne Vandermale Tuuk, Asst. U.S. Atty., Grand Rapids, Mich., for McKinnon, Webb, Kowalski, Jondall, & Dowdy.

Francesco Isgro, Immigration & Naturalization, Washington, D.C., Elizabeth Hacker, Immigration & Naturalization, Detroit, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

### I. Background

In August, 1984 the Court certified a class of litigants for the purpose of pursuing this lawsuit against officials of the Immigration and Naturalization Service (INS), the United States Border Patrol (USBP) and unknown local law enforcement agencies, all of whom allegedly are involved in unlawful searches and seizures of Hispanics in this jurisdiction.

In certifying the class pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court expressed concern for the Fourth Amendment rights of Hispanic-appearing citizens, residents and legal workers. Although it has long been the rule that evidence obtained in violation of the Fourth Amendment cannot be used in legal hearings against individuals, *Silverthorne Lumber Company v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the Supreme Court recently permitted evidence which had been unlawfully obtained by the INS to be used against a Hispanic man at a deportation hearing. *INS v. Adam Lopez-Mendoza*, 468 U.S. ——, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). That ruling effectively negated the deterrent effect of the exclusionary rule, *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), for many Hispanics.

In the present proceedings for preliminary injunctive relief, Plaintiffs claim imminent harm because of ongoing INS searches and seizures. They argue that their affidavits, live testimony, and exhibits indicate the Defendants are pursuing investigations that are constitutionally impermissible, and they request a preliminary injunction to require that Defendants act according to specific guidelines in conducting workplace searches, pedestrian stops and interrogations, and car stops.

The Defendants argue that the extraordinary relief of an injunction is inappropriate in this case, because the Plaintiffs have an available money damages remedy. However, there is no *per se* rule against suing for damages and injunctive relief in a single lawsuit. *Twyman v. Rockville Housing Authority*, 99 F.R.D. 314, 324 (1983), citing the rule of *Robinson v. Lorillard*, 444 F.2d 791, 801–802 (CA 4 1971), *cert. dismissed*, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 665 (1971).

Defendants also argue that the Supreme Court's recent rule regarding standing in lawsuits for injunctive relief is a bar to this action. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The *Lyons* ruling is distinguishable from this case, both because *Lyons* was not a class action and because the issue of statistical improbability underlying the *Lyons* ruling is not implicated in this suit. *See, Lewis v. Tully*, 99 F.R.D. 632 (1983). Nor is this case controlled by the Supreme Court's ruling in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). *Rizzo* was a § 1983 action in which the plaintiff class alleged isolated violations by a city's police department and demanded relief which would have resulted in a massive intrusion by the federal government into local affairs. Again, statistical improbability is not involved here, and the federalism issue is factually irrelevant.

Although certain testimony and affidavits were offered regarding farm owners' complaints about INS and USBP intrusions on their property, that question is not properly before the Court. The Plaintiffs in

this lawsuit cannot assert the rights of their employers to be free from INS and USBP practices. *Illinois Migrant Council v. Pilliod, (Pilliod 1 )*, 398 F.Supp. 882 (ND Ill.1975), *aff'd, Illinois Migrant Council v. Pilliod (Pilliod 2 )*, 540 F.2d 1062 (CA 7 1976) *modified en banc, Illinois Migrant Council v. Pilliod (Pilliod 3 )*, 548 F.2d 715 (CA 7 1977); *See also, Illinois Migrant Council v. Pilliod (Pilliod 4 )*, 531 F.Supp. 1011 (ND Ill.1982). "The Fourth Amendment confers rights which cannot be asserted vicariously." *Pilliod 1* at 900. Therefore, the Court will not address the "open fields doctrine" issue raised during the proceedings. However, *e.g., see, Oliver v. United States,* — U.S. ——, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 894 (1924).

## II. The Preliminary Injunction

■ In considering a motion for a preliminary injunction, the Court does not determine a case on the merits; rather, the Court determines whether there is sufficient evidence to support the exercise of its discretionary power to issue preliminary equitable relief. *Adams v. Federal Express Corporation,* 547 F.2d 319 (CA 6 1976). The general guidelines are set forth in *Mason County Medical Association v. Knebel,* 563 F.2d 256 (CA 6 1977):

1. Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits.

2. Whether the plaintiffs have shown irreparable injury.

3. Whether the issuance of the preliminary injunction would cause substantial harm to others.

4. Whether the public interest would be served by issuing a preliminary injunction. *Id.* at 261.

### A. Probability of Success on the Merits

In this lawsuit, Plaintiffs have alleged violations of their Fourth Amendment rights in four settings. Only three of the settings are in issue in the present proceedings: the workplace, the vehicle stops, and pedestrian stops and interrogations.

■ There is no single Fourth Amendment doctrine that addresses all three settings. The Fourth Amendment protects the privacy rights of individuals, and as the individual changes settings, or changes his or her expectations of privacy, the Fourth Amendment protection of the privacy also changes. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967):

> What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. *See Lewis v. United States,* 385 US 206, 210, 17 L Ed 2d 312, 315 87 S Ct 424 [427]; *United States v. Lee,* 274 US 559, 563, 71 L Ed 1202, 1204, 47 S Ct 746 [748]. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. *See Rios v. United States,* 364 US 253, 4 L Ed 2d 1688, 80 S Ct 1431; *Ex Parte Jackson,* 96 US 727, 733 [6 Otto 727, 733], 24 L Ed 877, 879. *Katz,* 389 U.S. 351–352, 88 S.Ct. 511–512.

A very recent Supreme Court decision reviewed the *Katz* holding and noted the general rule:

> Since *Katz v. United States,* (citation omitted) the touchstone of [Fourth] amendment analysis has been the question whether a person has a "constitutionally protected reasonable expectation of privacy." (Citation omitted) The amendment does not protect the merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as "reasonable". *Smith v. Maryland,* 442 US 735, 740–741, 99 S Ct 2577 [2580–2581], 61 L Ed 2d 220 (1979). *Oliver v. United States,* [——] US [——], 80 L Ed 2d 214, 104 S Ct [1735] (1984).

Therefore, the Court will analyze separately each of the settings in which the Plaintiffs claim an ongoing constitutional violation.

## 1. The Vehicle Stops

The United States Congress authorizes immigration officers "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States", 8 U.S.C. § 1357(a)(1), and "to conduct a search, without warrant, of the person, and of the personal affects of any person seeking admission to the United States, concerning whom such officer may have reasonable cause to suspect that grounds exist for exclusion from the United States..." 8 U.S.C. § 1357(c). As *Pilliod 2, supra,* stated:

Congress' plenary power to exclude aliens has been described as "a power to be exercised exclusively by the political branches of government." . *Kleindienst v. Mandel,* 408 US 753, 765, 92 S Ct 2576, 2583, 33 L Ed 2d 683 (1972). " '[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Id* at 766, 92 S Ct at 2583, quoting from *Oceanic Steam Navigation Company v. Stranahan,* 214 US 320, 339, 29 S Ct 671 [676], 53 L Ed 1013 (1909). *Pilliod 2* at 1072.

But Congress may not legislate away the constitutionally protected right of individuals to be free from unreasonable search and seizure:

The needs of law enforcement stand in constant tension with the Constitution's protection of the individual against a certain exercise of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg trials:

"These [Fourth Amendment rights], I protest, are not mere second-class rights, but belong in the catalogue of indispensible freedoms. Among deprivation of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. *Brinegar v. United States,* 338 US 160, 180, 93 L Ed 2d 1879, 69 S Ct 1302 [1313] (Jackson, J. dissenting)."

*Almeida-Sanchez v. United States,* 413 U.S. 266, 273–274, 93 S.Ct. 2535, 2539–2540, 37 L.Ed.2d 596 (1973). In *Almeida-Sanchez,* the Supreme Court stated that the immigration service's enforcement statute could not authorize Fourth Amendment violations. The Supreme Court threw out the conviction of a drug smuggler whose automobile was stopped without probable cause near the Mexican border.

■■■ Subsequent Supreme Court rulings have focused the constitutional inquiry into immigration search and seizure even further. The stopping of a vehicle implicates the Fourth Amendment. *See, United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). Seizure may not occur without valid reason by law enforcement officials. *Delaware v. Prouse,* 440 U.S. 648, 654–655, 99 S.Ct. 1391, 1396–1397, 59 L.Ed.2d 660 (1979). The reasonableness of a vehicle seizure requires a balancing of the individual's constitutional right to be free from arbitrary interference and the immigration service's statutory duty to seek out illegal aliens. *United States v. Brignoni-Ponce, supra.* Reasonableness in all cases must be measured by an objective standard, not by the discretion or the subjective impressions of the particular officer. *United States v. Rocha-Lopez,* 527 F.2d 476 (CA 9 1975); *Delaware v. Prouse, supra,* at 440 U.S. 648, 99 S.Ct. 1391. Specifically, officers on roving patrol who stop and seize a vehicle must provide objective "articulable facts" for doing so. *Brignoni-Ponce, supra,* at 422 U.S. 884, 95 S.Ct. 2581.

■■■ The case-law establishes that when an immigration officer stops a vehicle near the border, the officer may take into consideration the area they are in; the traffic patterns; previous experience with alien traffic and reasonable inferences drawn therefrom; occupants' behavior, suggest-

ing evasion or erratic driving; aspects of the car such as fold-down seats or spare tires in which concealed aliens might hide; the weighted-down appearance of the car; or manner of dress indicating Mexican citizenship. *Id.* at 422 U.S. 884–885, 95 S.Ct. 2581–2582.

A seizure will never be considered reasonable if the officer stopped the vehicle near the border *solely* because of the Mexican ancestry of the occupant. *Id.* at 885–887, 95 S.Ct. 2582–2583.

The legal test for a vehicle stop requires specific articulable facts:

Officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that vehicles contain aliens who may be illegally in the country. *Brignoni-Ponce* at 422 U.S. 884, 95 S.Ct. 2581.

The facts of the vehicle stops in the case before this Court vary significantly from the predicate facts of *Brignoni-Ponce*. Significantly, the vehicle stops all took place in Michigan, very distant from the Mexican border. There is no issue of smuggling Hispanics across a border. The stop of Juan Guzman's car on September 21, 1984 was performed by an officer who ostensibly wanted to ask Mr. Guzman about his tinted windows. (Exhibit B to Plaintiffs' brief.) The officer who stopped Mary Ramirez on September 24, 1984, apparently gave no reason at all for stopping her; he only questioned her about her citizenship. (Exhibit C to Plaintiffs' brief.) The officers who stopped the Soto car on September 24, 1984, interrogated the four occupants about their citizenship but gave no reasonable explanation for stopping the car. (Exhibit P to Plaintiffs' brief.) Similarly, the stop of the Rangel vehicle on September 24, 1984, after the Border Patrol did a U-turn to follow Rangel, was performed with no apparent reasonable articulable facts for such a stop. (Plaintiffs' Exhibit R.) The affidavits of Theresa Schullo and Maria Aguilar, respectively a party store clerk and a receptionist of the

Migrant Intermediate Care Center, indicate that the vehicle stops in this district, at least during this agricultural season, occur with some frequency. (Plaintiffs' Exhibits KK and Y.) Their numerous additional affidavits, as well as the live testimony of Robert Mireles, indicate that it is the practice of the immigration officers to stop Hispanic appearing persons solely because of their appearance, or because they are driving older cars, are dressed in work clothes, or have out of state license plates. Such facts, without more to indicate illegality, cannot justify the subjugation of individual rights.

It must be remembered that *Brignoni-Ponce* was a case based on an extreme setting—i.e. within 25 miles of the Mexican border, and on a known smuggler's route. Even in the border smuggling context, the Supreme Court required articulable reasons for stopping the car before it would consider the legitimate goals of the immigration service as outweighing the normal Fourth Amendment rights of the individuals stopped.

The Defendants' affidavits and live testimony do not help their case; indeed, in some instances their testimony is quite harmful to their stated legal positions. The affidavit of Officer Buzaitis states, in regard to the Soto vehicle stop, that he was patroling in a region containing a heavy concentration of migrant labor during the harvest season, that he glimpsed a car whose occupants he wanted to observe more closely, that he followed it and questioned the passengers about their right to remain in the United States. (Defendants' Exhibit J.) There is a question whether the Sotos were pulled over, or whether, as Officer Buzaitis states, he came upon them after they had stopped. The difference might have some doctrinal significance, but that does not erase the doubt in my mind concerning the articulable facts which formed the basis of the officer's original reason for following the automobile. I am troubled by the officer's statement that "... in all instances when I question a person concerning his or her immigration

status, I determine whether there is a reasonable suspicion that the person is an alien based upon several factors, including, among others, physical appearance, language ability, geographic area where the encounter occurs, manner of dress, and any inferences reasonably drawn from my experience and training." (Defendants' Exhibit J, pp. 2–3.) [1]

My concern stems from the fact that the sequence of establishing a reasonable suspicion of illegal alienage is out of sync. It would appear that Officer Buzaitis believes he can stop a vehicle and *then* discover reasonable articulable facts for doing so, based on closer observation and interrogation. That is not the case law or the constitutional principle. The reasonable articulable facts must *precede* the stop.[2]

If there are no present articulable facts, a stop may not occur. *Brignoni-Ponce.* If an individual is to be stopped in an automobile, and that individual's privacy thereby subjugated, there must be sufficient articulable facts preceding the stop, which establish a reasonable governmental *need* for the stop, and which thereby outweigh the rights of the individual. The train of logic—articulable facts leading up to a stop—may not be reversed as apparently occurred in the Soto stop.

I am also troubled by the Soto stop because of the "articulable facts" (physical appearance, language ability, geographic area where the encounter occurred, manner of dress and any inferences reasonably drawn from his experience.) I analyze the officer's stated facts as follows:

1. *Physical appearance.* Because the officer, later in his list of facts, states "manner of dress" as another factor, it appears that "physical appearance" may mean the *Hispanic* appearance of the individual. That is not a valid reason to stop anyone.

2. *Language ability.* Language ability can only be determined *after* a stop, so it cannot be a valid basis for *stopping* an automobile.

3. *Geographic area.* An agricultural region in Michigan is not identifiable by this Court, from a reading of pertinent case law, as an intrinsically suspect geographical area similar to the border. A particular farm conceivably may be shown to be a suspect geographical area, but that requires reasonable statistical proof.

4. *Manner of dress.* Manner of dress was a valid articulable factor in *Brignoni-Ponce,* but with a limitation—the manner of dress taken into account by the border patrol indicated that the suspects in fact were dressed like people who live in Mexico. *Brignoni-Ponce* at 422 US 885 [95 S.Ct. 2582]. The suspicious manner of dress was not related to work clothes. It is difficult to ascertain from the affidavits if the manner of dress of the passengers in the Soto car were indicative of people who live in Mexico, or simply indicative of people who do field work. The live testimony of General Emil Orsack of the INS indicated that working clothes are considered a valid articulable factor in stopping individuals for questioning. That is not, however, the case law.

5. *Inferences drawn from articulable facts.* Immigration officers may draw inferences from valid articulable facts, in formulating the decision to stop a vehicle. The inferences, however, must be based on objective facts. Inference alone is merely "discretion". There is absolutely no discretionary right of any officer to stop a vehicle. A stop based solely upon the discretion of an individual officer is unconstitutional.

I find other similarly troubling revelations in the Defendants' evidence. At

---

**1.** The words of the officer are taken almost verbatim from M–69. While constitutionally correct, the conclusory nature of the words quoted here is not factually persuasive regarding the circumstances of the vehicle stop.

**2.** As a corollary to footnote 1, I note that the officer's conclusions about the constitutional prerequisites to a "stop" appear to comport with a pedestrian stop, and not a vehicle stop.

pages 3 and 4 of Defendants' Exhibit J, an officer notes that he followed a car containing four Hispanics because, at least in part, they were dressed in clothing common to agricultural workers and appeared to avoid his gaze. The Hispanics were riding in an older car with Florida license plates and were in a region of high migrant population during the harvest season. There was no other apparent reason for stopping the car. Defendants' Exhibit M indicates that an officer initiated an investigation based solely on an anonymous tip. There were no facts, save a phantom informant. Defendants' Exhibit N suggests that Michigan farms are targeted as suspect areas if, over a five and one-half year period, 63 aliens who were arrested either worked at the farm or "claimed to be employed at the farm". Such a statistic is slim indeed, and of dubious origin. Similarly, Defendants' Exhibit O indicates that appearance, dress, English language ability, and the agricultural locale provided the questionable basis for a vehicle stop and interrogation.

I especially note Defendants' Exhibit 1, the M-69 document entitled, *US Department of Justice Immigration and Naturalization Service, "The Law of Arrest, Search and Seizure for Immigration Officers"* (Revised 1983), at p. 3:

### Degree of Suspicion

4. *Reasonable suspicion that a vehicle contains an alien or aliens who may be in the United States illegally* —the degree of suspicion which an immigration officer on roving patrol (or at temporary checkpoints in the Ninth Circuit) must have before he may constitutionally stop a vehicle to question its occupants. This suspicion may be based on factors similar to those described in 3. above as well as on features of the vehicle such as fold down seats, spare tire compartments where a person could be concealed, a large number of passengers, or an unusually heavy load.

The "reasonable suspicion" analysis of the above excerpt from M-69 seems to permit immigration officers in Michigan to consider factors that are only valid near the Mexican border. The type of vehicle which might be used for smuggling aliens in small compartments at the border should not logically be weighed the same, once the use of the small compartments ceases to be a factor. That is, a make of car with a hidden tire-well might be suspect at the border because it might, during a border-crossing, contain an illegal alien. On the border the *per se* fact of the type of car is significant. Once that same car is several thousands of miles away from the Southwestern United States border, does the hidden tire-well still have some significance? Are the illegal aliens conceivably going to travel thousands of miles inside that confined space? Generally, are there "inland factors" which may be articulated to establish standards for the INS and USBP roving patrols in Michigan? [3]

The testimony of General Orsack, head of this INS sector, suggests there should be, but there probably is not, a localized standard for INS search and seizure. The General's testimony suggests there is a woeful laxity of statistical records regarding search and seizure, and there may be a lack of supervision over officers who conduct the "operational details" in this jurisdiction.

Based on the foregoing discussion, I believe there is sufficient evidence to establish the likelihood of success on the merits in regard to Plaintiffs' claims concerning vehicle stops to justify the issuance of a preliminary injunction in that regard, inasmuch as immigration service officers in this jurisdiction appear to be acting contrary to their own M-69 manual, and, more importantly, contrary to the Fourth Amendment.

### 2. Pedestrian Stops

In reflecting upon the issue of pedestrian stops of Hispanics in this jurisdiction, the

---

**3.** I do not, and will not answer these questions because it is not the duty of a court to write instruction manuals. I will, however, rule on whatever constitutional violations I find, because that *is* the duty of a court.

Court considers the stop and questioning of Sally Aleman and her husband as a paradigm. The testimony of Ms. Aleman and Officer Huffman (Defendant's Exhibit C) apparently describe the same incident. Huffman describes a setting in which a Hispanic woman with a Hispanic man, on a sidewalk in Hartford, Michigan, were spotted and approached because (a) the man appeared to be Hispanic in an area frequented by illegal Hispanic aliens; (b) the man's dress was "gaudy", such as is frequently worn by illegal aliens on their days off; (c) the Hispanic looked at the officer's vehicle in a pronounced way; (d) the officer's experience suggested the Hispanic was an illegal alien. Ms. Aleman's recitation of the facts, including her description of her husband's shirt—wine red with white feathers—conforms to the officer's account, although she recalls the incident as occurring in October, while the officer recalls the incident as occurring in July. Ms. Aleman testified that she and her husband were on their way to a movie, and that during the two officers' questioning of her and her husband, she was frightened and believed she was not free to leave. She stated that she was frightened by the officers' official manner and by their guns, although the guns were never drawn from the holster. Officer Huffman states in his affidavit that he and his colleague questioned the couple for no more than two or three minutes.

The Defendants' M–69 document correctly notes that the case law regarding the stopping and questioning of pedestrians is less clear than the rules of vehicle stops. (Defendants' Exhibit 1, page 9, subsection 2). The immigration service is not alone in its wonderment at the subtlety of search and seizure doctrine, in this area.

Justice Rehnquist, writing for the Supreme Court, recently stated:

> Although we have yet to rule directly on whether mere questioning of an individual by a police officer, without more, can amount to a seizure under the Fourth Amendment, our recent decision in [*Florida v. Royer*, 460 U.S. 491, 75 L.Ed.2d 229, 103 S.Ct. 1393 (1983) (plurality opinion)] plainly implies that interrogation relating to one's identity or a request for identification does not, by itself, constitute a Fourth Amendment seizure. *INS v. Delgado*, [——] US [——, ——], 80 L.Ed.2d 247, 255, 104 S.Ct. [1758, 1762] (1984).

In the *Royer* case, Drug Enforcement Agency Officers, using a drug courier "profile" to determine likely drug traffickers, approached a suspect who matched the "profile" of illegal types.

Justice Rehnquist also noted the case of *Brown v. Texas*, 443 U.S. 47, 61 L.Ed.2d 357, 99 S.Ct. 2637 (1979). In *Brown*, two police officers asked a pedestrian to identify himself, and he refused. The officers then detained the man. Chief Justice Burger, writing for the Supreme Court, stated that the detention was a violation of the Fourth Amendment:

> ... because the officers lacked any reasonable suspicion to believe appellant was engaged in or had engaged in criminal conduct. *Id.* at 443 U.S. 53, 99 S.Ct. 2641.

In *Delgado*, Justice Rehnquist did not reach the issue of what amount of justification for detention is required under *United States v. Mendenhall*, 446 U.S. 544, 64 L.Ed.2d 497, 100 S.Ct. 1870 (1980), because he did not find that a seizure had occurred. However, Justice Rehnquist makes clear that in order to stop and question a pedestrian, there must be some *reasonable suspicion of illegal conduct.*

In contrast to the rule of *Delgado, Royer,* and *Brown,* the immigration service follows the rule in pedestrian cases that:

> ... to question a person concerning his right to be in the United States, as distinguished from detaining him, *a reasonable suspicion of alienage* is all that is required. (Emphasis added). (Defendant's Exhibit 1, page 9, subsection 2).

The M–69 manual defines "reasonable suspicion of alienage" as follows:

> 2. *Reasonable suspicion of alienage* —the degree of suspicion that an immigration officer must have before he may,

pursuant to INS policy guidelines, *question* a person. (In the Southern District of New York an officer must have a reasonable suspicion that the person is an alien illegally in the United States. See 3 below.) This suspicion must be based on more than ethnic physical appearance, e.g., Mexican or Chinese ancestry. This "reasonable suspicion" must be based on "specific articulable facts"—particular characteristics or circumstances which the officer can, if called upon, describe in words—such as foreign manner of dress or grooming, apparent inability to speak English, officer's knowledge of a high concentration of aliens in the area, or a specific tip from an informant. (*Id.* at p. 3, subsection 2).

The authors of M–69 explain their reason for following a "reasonable suspicion of alienage" standard instead of the New York "reasonable suspicion of illegal alienage" standard as follows:

> The Supreme Court did not decide this question in *Brignoni-Ponce*. The Courts of Appeals for the Seventh and Ninth Circuits and for the District of Columbia have held that to question a person concerning his right to be in the United States, as distinguished from detaining him, a reasonable suspicion of alienage is all that is required. (Footnote omitted) It is Service policy to follow this rule nationwide ... (Defendant's Exhibit 1, page 9, subsection 2).

I cannot agree with the M–69 authors' reasoning or conclusion as it applies to this jurisdiction.

It is true that Justice Powell did not expressly address the question of pedestrian stops in *Brignoni-Ponce*, because *Brignoni-Ponce* was not a pedestrian stop case. Justice Powell did note, however, that:

> ... when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly ... *Brignoni-Ponce, supra,* at 422 U.S. 881, 95 S.Ct. 2580.

If that is a miss, as M–69 claims, it is near miss. In fact, the Second Circuit, in analyzing a pedestrian stop and questioning, did not consider it a miss at all. The Second Circuit, like *Delgado, Royer, Brown,* and *Brignoni-Ponce,* required some reasonable suspicion of illegal conduct (e.g. illegal alienage) as a basis for immigration officers stopping and questioning an alien pedestrian. *United States v. Sugrim,* 732 F.2d 25 (CA 2 1984).

■ In light of Justice Powell's opinion in *Brignoni-Ponce,* Justice Burger's opinion in *Brown,* Justice White's opinion in *Royer* and Justice Rehnquist's opinion in *Delgado,* the New York rule must apply in this jurisdiction. Therefore, before an immigration officer stops and questions a pedestrian such as Ms. Aleman, the officer must have a reasonable suspicion of illegal alienage.

The statement of the constitutional rule governing this case does not necessarily require that a preliminary injunction issue. Justice Rehnquist noted in *Delgado:*

> What is apparent from *Royer* and *Brown* is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. *Delgado, supra,* — U.S. at ——, 104 S.Ct. at 1762, 80 L.Ed.2d at 255.

As the Court's focus in this discussion is precisely on the question of "likelihood of success", Justice Rehnquist's words have added emphasis.

■ In reviewing the facts of the paradigm Aleman stop, the Court finds there may have been reasonable suspicion of illegal alienage. The officer states that the red shirt with white feathers indicated illegal alienage. The geographical area, the officer stated, is known to be frequented by illegal aliens.

In the context of the preliminary injunction proceedings, the Court is unable to conclude that there is a high likelihood that the immigration officers did not have a reasonable suspicion of illegal alienage. The officers may be able to prove at trial that illegal aliens wear "gaudy" clothing, and the officers may also be able to show by preponderating statistical evidence that

the geographical area around the stop is reasonably suspected of harboring illegal aliens. Those facts are, at this point, of large significance but little certainty. Therefore, under the substantial likelihood prong of the *Mason County* test, the Court will not issue a preliminary injunction as to the pedestrian stop issue. The parties are advised, however, that the foregoing analysis of the constitutional prerequisites necessary to stop a pedestrian forms "the law of the case", and will form the guidelines for considering the evidence when trial takes place. Conduct of Defendants between the date of this Opinion and trial should, of course, conform to the law as discussed, *infra*.

### 3. Workplace Surveys

In comparison to the foregoing discussion of vehicle seizures and street seizures, the discussion of workplace surveys will appear attenuated.

Plaintiffs rely on *Mancusi v. Deforte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) for the proposition that workers have a reasonable expectation of privacy in their workplace. *Mancusi* implemented the logic of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), to the effect that individuals on premises where a search occurs may challenge its legality when the fruits of the search are to be used against the individual in subsequent legal actions. In light of *Lopez-Mendoza* and *Delgado*, it is clear that *Mancusi* is inapplicable in this case as a matter of public policy. The only apparent way *Mancusi* could apply to this case would be for Plaintiffs to prove statistically that the relevant workplaces are not predominantly Hispanic. They have not done so.

■ The Supreme Court's recent rulings regarding workplace surveys indicate that a Hispanic individual's expectation of privacy in a workplace where Hispanics predominate is outweighed by the government's interests in surveying those workplaces. The foundation of the policy decision is encapsulated in Justice O'Connor's characterization of deportation proceedings in general:

... [a deportation hearing] is designed to provide a streamline determination of eligibility to remain in this country, nothing more. *Lopez-Mendoza, supra,* 468 U.S. at ——, 104 S.Ct. at 3485, 82 L.Ed.2d at 786.

The burden of discovering illegal aliens in the Hispanic workplace requires that administrative efficiency prevail over some traditional notions of constitutional restraint.

The relaxation of constitutional safeguards is not total, of course. In *Delgado*, Justice Rehnquist wrote that a seizure requiring constitutional justification may occur in the workplace if, in view of all the circumstances surrounding the questioning, the worker reasonably believes himself or herself unable to leave freely. *Delgado* — U.S. at ——, 104 S.Ct. at 1762, 80 L.Ed.2d at 255. But in *Delgado*, because technically there was no seizure, Justice Rehnquist did not go on to instruct what justification would have been required in regard to each individual questioning of a worker. (The Ninth Circuit holding in *International Garment Workers Union v. Sureck*, 681 F.2d 624 (CA 9 1982), which was overruled in *Delgado*, merely assumed that a "detentive questioning" tantamount to seizure had occurred during the workplace survey, because border patrol agents were stationed at the exits. That assumption led the Ninth Circuit to require constitutional justification of each of the questionings. The Supreme Court's holding that no seizure occurred presumably displaces the Ninth Circuit's subsequent reasoning regarding the justification required.)

■ I note that the affidavits of Eutiquio Montoya at Plaintiffs' Exhibit H; Vladimira Medrano, at Plaintiffs' Exhibit N; and Simon Zuniga at Plaintiffs' Exhibit Z all indicate that the immigration officers' questioning of the worker was done in the open, unlike the arguably more confining situation in *Lopez-Mendoza* and *Delgado*. The affidavits indicate that the workers

were somewhat fearful of the immigration officers, but none of the Plaintiffs tried to leave. The fields were never completely surrounded. The affidavits indicate that the immigration officers' interrogations were, with the possible exception of the Medrano questioning, short-lived and polite. In fact, the testimony by Mr. Blodgett and Mr. Gaskill indicate that the most serious confrontation in the setting of the workplace surveys in this district may be the confrontation between land-owners and immigration officers. *See e.g.,* Blodgett affidavit at Plaintiffs' Exhibit AA. Again, it is axiomatic that the Plaintiffs in this lawsuit cannot assert rights of their employers. *Pilliod 1* at 900.

Having before me the recent Supreme Court holdings in *Delgado* and *Lopez-Mendoza,* as well as the parties' affidavits concerning workplace surveys, I cannot find a substantial likelihood of success on the merits of the workplace survey issue. Therefore, a preliminary injunction against workplace surveys may not issue.

### B. Showing of Imminent Irreparable Injury

There is no debate that a continuing injury to the constitutional rights of an individual is irreparable harm. *Planned Parenthood v. Citizens for Community Action,* 558 F.2d 861 (CA 8 1977). Nor is there debate whether law enforcement violations which have been shown to have occurred and which will apparently continue to occur, justify the issuance of a preliminary injunction. *See e.g.* the *Pilliod* case-line, *supra; Nicacio v. INS,* 595 F.Supp. 19 (ED Wash.1984); generally, *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1964); *IGWU v. Sureck, supra.*

Defendants, however, contest the validity of the imminent, ongoing injury alleged by Plaintiffs because Plaintiffs' affidavits are stale, and because Plaintiffs have alternative legal remedies under the Federal Tort Claims Act or under a *Bivens* theory cause of action.

The imminence issue raised by Defendants is one which the Court also raised at the first hearing on this matter. It initially appeared that Plaintiffs were relying heavily on affidavits relating to alleged dwelling raids in 1980, as well as various vehicle, pedestrian, and workplace stops of recent years. Assuredly, such stale affidavits would not satisfy the imminence requirement of *Mason County.*

However, the Court has received sufficient affidavits involving incidents occurring during the recent months of 1984 to recognize that the disputed incidents, whether or not they eventually are determined to be unconstitutional, are, in fact, numerous and ongoing. The affidavits and exhibits of the Defendants do nothing to suggest the practices allegedly injurious to the Plaintiffs have been discontinued. Instead, Defendants' evidence illustrates consistent, ongoing conduct.

Therefore, I find that this step of the *Mason County* test has been satisfied. There is a potential ongoing irreparable injury validly before the Court.

### C. Substantial Harm Flowing to Others from the Preliminary Injunction

The Court is mindful that immigration officers feel caught in a cross-fire between the Constitution and Congress. Congress enacted 8 U.S.C. § 1357 to require the officers to seek out illegal aliens, but the Courts have invoked the Constitution to limit the officers' performance.

My reading of the affidavits and exhibits has convinced me that immigration officials often go out of their way not to visit a hardship on Hispanic suspects. There is evidence that these officers grant extended departure visas, and similar deference to detainees. The fact that these officers perform within the bounds of humane discretion is, in fact, worthy of emphasis in this Opinion. It is also encouraging to recognize that the officers are very aware of case-law principles relating to their work.

It is precisely because the officers are intelligent and are aware of the relationship between their work and case-law that

it is unlikely that they would suffer a substantial harm from an appropriate equitable order issued by the Court.

Therefore, I do not find the "substantial harm to others" consideration controlling or troubling in this case.

#### D. The Public Interest

The Plaintiffs have stressed in their oral argument that this case has nothing to do with illegal aliens. They emphasize that this case is brought by legal citizens, residents, and legitimate workers in the United States. In other words, the Plaintiffs *are* the public. Their interest *is* the public interest.

The Defendants would rather focus the Court's attention on a "public" defined in larger terms. Defendants stress that the abstract benefit of excluding illegal aliens through the Immigration and Nationality Act extends to virtually every citizen and resident. Officer Pfeifer, Investigator Falkowski, and General Orsack all testified that there would be a "chilling effect" (reminding me of the First Amendment—not the Fourth, and sounding somewhat rehearsed) on immigration officers in the event that this Court issued the injunction proposed by Plaintiffs. I am particularly not persuaded, however, by that single sweeping assertion. The assertion is based on the fact, as asserted by Pfeifer, Falkowski, and Orsack that the average immigration officer would be confused by yet another Court opinion, and therefore would be unwilling or unable to operate in this jurisdiction. In fact, the preliminary injunction anticipated by the Court adds virtually nothing, except the weight of immediacy, to the constitutional rules of search and seizure.

The Court's deliberation on the Plaintiffs' Motion for a Preliminary Injunction has, perhaps to a greater degree than any recent case, focused on the public interest prong of the *Mason County* test. The Court has weighed the strong public interest in preventing illegal aliens to be present in this jurisdiction, and the Court has weighed the strong public interest of the Plaintiff class in being free from unreasonable search and seizure. Additionally, the Court has weighed the general public's interest in assuring that its federal immigration officers, who enjoy a somewhat broader-than-normal scope of police power, do not exceed the scope of their authority.

The testimony of General Orsack, a polite and cooperative witness, would indicate that INS officers operating in this jurisdiction under his control do not, in fact, understand the constitutional limitations on their police power. General Orsack's testimony strongly suggests that officers may act against the public interest, both as to the specific class of Plaintiffs in this legal action, and as to the general public. The Court derived the impression from General Orsack's testimony that:

1. Although "geographical area" is a significant factor in deciding to stop a vehicle, the agency does not keep statistics, or develop reliable statistical proof regarding specific suspect sites. This suggests the possibility of arbitrary determinations of suspect geographical areas.

2. The M–69 document sets search and seizure policies for the immigration service. Following the 1983 revision of the M–69 document, there may not have been sufficient agency procedures to ensure that all INS officers comprehend the revisions. This suggests that officers may not be apprised of case law development and may not be capable of conforming their conduct accordingly.

3. General Orsack, who is in charge of the Sector which includes Michigan, Ohio, Illinois and Indiana, testified that he does not perceive a substantial difference between automobile stops in El Paso, Texas, and Hartford, Michigan. General Orsack also testified that M–69 sets a national policy and further, that he perceives there to be a local policy of search and seizure but that he is uncertain as to how the local policy is promulgated. All of this data, and additional data elicited by affidavits and live testimony, indicate that the immigration ser-

vice may not sufficiently distinguish between search and seizure conditions and factors theoretically existing in the Southern and Southwestern part of this country, and those circumstances existing in this jurisdiction.

4. General Orsack, who is in charge of all officers of the INS in this jurisdiction, testified that a stop of a vehicle would not be justified on the following facts: old car, Hispanic driver, agricultural area, work clothes, and glancing at an INS automobile. Yet, on the basis of the Defendants' affidavits, it would appear that vehicle stops are, in fact, rationalized on that set of facts, and in many instances—less facts. This would suggest that immigration officers are not following local agency policy.

5. Following his cross-examination testimony concerning the hypothetical facts set forth in ¶ 4 above, General Orsack appeared to testify that "reasonable suspicion" and "articulable facts" are best determined by the officers' personal experience. This conclusion is, of course, wrong for at least two reasons: (1) the individual officer may have no experience except at the Mexican border, as the General testified, and may be acting alone and without supervision, and therefore without knowledge of local policy; and (2) the factors which the General did not believe were sufficient for a stop were stated as sufficient in the affidavits of the officers, and even fewer factors amounted to "articulable facts" in some of their affidavits.

6. General Orsack testified that he is the agency officer in charge of ensuring compliance with the guidelines set forth in the M–69 manual. The General testified that he "assumes" that officers follow the M–69 manual. He further testified that in 14 years service in the INS, he has never reprimanded an officer for an unconstitutional search. When questioned as to whether individual immigration officers would stop a vehicle under the hypothetical circumstances in paragraph 4 above, General Orsack testified, "I can't speak for each individual offi-

cer." This would suggest the possibility that supervision over local search and seizure practices may be unsystematic. One cannot have it both ways: on the one hand expressing total confidence in the officers' understanding of M–69 and the Constitution, while on the other hand expressing a lack of knowledge about the officers' actions while on "operational details" in this jurisdiction.

7. Testimony and affidavits offered by the Defendants indicate the possibility that search and seizure of vehicles in this jurisdiction rests largely or solely in the discretion of the individual immigration officer.

The public interest in a systematic and constitutional local policy of search and seizure is clear and compelling.

### III. Conclusion

A central issue in this case, as the description of the Plaintiff class indicates, is whether Hispanic appearing United States citizens and residents are unreasonably singled out for intrusion and interrogation by immigration officers. In reflecting on the arguments of the parties—the Plaintiffs claiming harassment and the Defendants claiming justification by way of national policy—I cannot help recalling the oft-cited fact that the United States is a "melting pot" nation.

In *Brignoni-Ponce*, Justice Powell wrote the following:

In this case the officers relied on a single factor to justify stopping respondent's car: the apparent Mexican ancestry of the occupants. We cannot conclude that this furnished reasonable grounds to believe that the three occupants were aliens ... Even if they saw enough to think that the occupants were of Mexican descent, this factor alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief the car concealed other aliens who were illegally in the country ... The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all

Mexican-Americans to ask if they are aliens. *Brignoni-Ponce* at 422 U.S. 885–887, 95 S.Ct. 2582–2583.

If we truly are a "melting pot" nation, then are we not, in Michigan, in the middle of the pot where the broth has most thoroughly combined? Has not most, if not all the separate, adverse inference of illegal alienage dissolved from Hispanic citizens and residents? Should not the weight of appearance lift from them, and should not the immigration officers be required to show, at this distance from the southern border, a commensurately heavier weight of factors other than appearance?

### INJUNCTION ORDER

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, and pursuant to this Court's written Opinion containing findings of fact and conclusions of law, attached hereto and made a part hereof, a preliminary injunction will issue on this date without security in accordance with the logic of the Court in *Bass v. Richardson*, 338 F.Supp. 478 (SD N.Y.1971).

IT IS HEREBY ORDERED:

THAT: JACK E. WEBB AND GREGORY KOWALSKI, BOTH INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY AS AGENTS OF THE IMMIGRATION AND NATURALIZATION SERVICE; PAUL E. McKINNON, BOTH INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS DISTRICT DIRECTOR OF THE IMMIGRATION AND NATURALIZATION SERVICE; JERALD D. JONDALL, BOTH INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS DISTRICT DIRECTOR OF THE UNITED STATES BORDER PATROL; RONALD DOWDY AND EDWIN W. EARL, BOTH INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY AS AGENTS OF THE UNITED STATES BORDER PATROL; JOHN DOES I THROUGH 44, BOTH INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AS AGENTS OF THE IMMIGRATION AND NATURALIZATION SERVICE OF THE UNITED STATES BORDER PATROL ARE RESTRAINED FROM STOPPING AUTOMOBILES IN THIS JUDICIAL DISTRICT CONTAINING PERSONS OF MEXICAN OR HISPANIC ORIGIN OR APPEARANCE, WITHOUT A VALID SEARCH OR ARREST WARRANT, OR WITHOUT FIRST HAVING IDENTIFIED OBJECTIVE ARTICULABLE FACTS AND REASONABLE INFERENCES TO SUPPORT A REASONABLE SUSPICION THAT THE VEHICLE CONTAINS AN ILLEGAL ALIEN. HISPANIC APPEARANCE ALONE IS NOT SUFFICIENT FACT TO JUSTIFY A STOP. THE SUBJECTIVE IMPRESSIONS OF THE OFFICER(S) ARE NOT ALONE SUFFICIENT TO JUSTIFY A STOP. THE OFFICER MAKING THE STOP SHALL IDENTIFY THE SPECIFIC ARTICULABLE FACTS LEADING TO THE STOP TO THE PERSON(S) STOPPED. THE DEFENDANTS SHALL KEEP A RECORD OF THE SPECIFIC ARTICULABLE FACTS RELIED UPON FOR EACH VEHICLE STOP, PENDING THE OUTCOME OF THIS LAWSUIT. THE RECORDS OF ALL AUTOMOBILE STOPS UNDER THE CONDITIONS OF THIS INJUNCTIVE ORDER SHALL BE ACCUMULATED AND MAINTAINED ACCURATELY AND ADEQUATELY TO BE PRODUCED UPON COURT ORDER.