787 F.2d 592
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
JESUS RAMIREZ, et al., Plaintiff-Appellee
v.
JACK E. WEBB, GREGORY KOWALSKI, individually and in their
official capacity as agents of Immigration & Naturalization
Service; PAUL E. McKINNON, individually and in his official
capacity as District Director of INS; JERALD D. JONDALL,
individually and in his official capacity as Director of
U.S. Border Patrol; RONALD DOWDY, EDWIN W. EARL,
individually and in their capacity as agents of the U.S.
Border Patrol; JOHN DOES 1 thru 44, both individually and in
their official capacity as agents of the INS of the U.S.
BORDER PATROL, Defendants-Appellants.
 85-1102
 United States Court of Appeals, Sixth Circuit.
 3/3/86
 
 AFFIRMED
 W.D.Mich., 599 F.Supp. 1278
 On Appeal from The United States District Court for the Western District of Michigan
 BEFORE: KEITH and GUY, Circuit Judges and TAYLOR*, District Judge.
 PER CURIAM:
 
 
 1
 This case involves a preliminary injunction brought by plaintiff class consisting of 'all persons of Hispanic origin or appearance' within the Western District of Michigan, enjoining the Immigration and Naturalization Service (INS) of allegedly unlawful vehicular stops.
 
 
 2
 On December 10, 1984, after a hearing on the preliminary injunction, the court below issued an order enjoining employees of INS from stopping vehicles occupied by plaintiff class members absent specific, articulable, facts to support a reasonable suspicion that an occupant is an illegal alien. The order provided that Hispanic appearance alone, buttressed by the officers subjective impressions, was an insufficient basis for stopping a vehicle. The order also required that: (a) the individual who is stopped be told that specific, articulable facts precipitated the vehicle stop; (b) a record be maintained on each vehicle stop, detailing the articulable facts leading to the stop; and (c) the records must be available for production on court order. Defendant INS has timely appealed to this court. For the reasons set forth below, we affirm the decision of the district court.
 
 
 3
 As a preliminary matter, defendant's contention that plaintiffs lack standing is meritless. Defendants primarily rely on Los Angeles v. Lyons, 461 U.S. 95 (1982), a case which held there was no standing. Lyons dealt with a single petitioner who was suing Los Angeles seeking an injunction barring the police department from using 'chokeholds'. Petitioner in that case had been previously rendered unconscious by a chokehold from a police officer, after being stopped for a traffic violation. The court held Lyons lacked standing: 'that Lyons may have been illegally choked by the police on October 6, 1976 . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation . . . In order to establish an actual controversy in this case, Lyons would have to allege he would have another encounter with the police . . .' Id. at 105-106.
 
 
 4
 The court below was correct in distinguishing Lyons from the present case. In Lyons, the odds that the individual plaintiff would be subject to a chokehold again were found to be quite low. Conversely, the odds that some Hispanic or Hispanic-looking person may be stopped in his vehicle for no articulable reason by an INS agent are obviously much greater. The Court of Appeals for the Second Circuit has aptly noted that 'the critical standing inquiry is whether a plaintiff is realistically threatened by a repetition of his experience or whether the claim is speculative.' Curtis v. City of New Haven, 726 F.2d 65, 67 (2d Cir., 1984). We hold that plaintiff class, being realistically threatened by unjustifiable vehicular steps in the future, has standing.
 
 
 5
 The central issue is whether the district court abused its discretion in issuing a preliminary injunction. The general guidelines for review of a preliminary injunction are set forth in Mason County Medical Association v. Knobel, 563 F2d. 256 (6th Cir. 1977):
 
 
 6
 1. Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;
 
 
 7
 2. Whether the plaintiffs have shown irreparable injury;
 
 
 8
 3. Whether the issuance of a preliminary injunction would cause substantial harm to others;
 
 
 9
 4. Whether the public interest would be served by issuing a preliminary injunction.
 
 
 10
 In regards to criteria number two, irreparable injury, the Supreme Court has said, in a First Amendment context, 'the loss of constitutional rights, for even minimal periods of time, unquestionably constitutes irreparable injury.' Elrod v. Burns, 427 U.S. 347, 373 (1976). This idea is likewise applicable when Fourth Amendment rights are at stake. Unreasonable searches and seizures, particularly when premised on race and alienage, are demeaning to such a degree as to be practically uncompensatable.
 
 
 11
 Criteria number three is satisfied insofar as it is difficult to see how the injunction causes harm 'to others', particularly the INS. All the preliminary injunction requires is that the INS not violate the Fourth Amendment by having 'articulable' grounds for stopping a Hispanic or Hispanic appearing person in his vehicle.
 
 
 12
 Criteria number four is also satisfied because it is eminently reasonable to believe that the public interest would be served by requiring INS agents to have 'objective articulable facts and reasonable inferences' to believe a vehicle contains an illegal alien, before stopping the vehicle.
 
 
 13
 The critical criteria, therefore, is number one: whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits? Defendants contend that U.S. V. Brignoni-Ponce, 422 U.S. 873 (1975) and U.S. v. Cortez, 449 U.S. 411 (1981) somehow support their position. To the contrary, these cases tend to support the legitimacy of the district court's order.
 
 
 14
 Brignoni-Ponce dealt with Mexican border patrol searches and stops; the court held that vehicular stops by officers based solely on the Mexican ancestry of the occupants was improper. Mexican appearance was only one relevant factor in determining the reasonableness of a stop. The court stated:
 
 
 15
 Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.
 
 
 16
 Brignoni-Ponce, at 884.
 
 
 17
 The court noted that officers may rely on a number of factors in making their stops: proximity to the border, the driver's behavior, i.e. evasive or erratic driving, the make of the car, as well as the dress and haircut of the driver. The court noted 'In all situations the officer is entitled to assess the facts in light of his experience.' Id. at 885. Significantly, the language in Brignoni-Ponce almost mirrors the mandate of the injunctive order to identify 'objective articulable facts and reasonable inferences to support a reasonable suspicion that the vehicle contains an illegal alien.'
 
 
 18
 Finally, logic dictates that Brignoni-Ponce's holding should apply, if anything, with more force thousands of miles away from the Mexican border; if objective criteria for vehicular stops is mandated where the problem of illegal aliens is the greatest, at the border, surely they are mandated where the problem is certainly not as great.
 
 
 19
 U.S. v. Cortez, 449 U.S. 4411 (1980) involved another illegal alien-vehicular stop case. There the court reaffirmed Brignoni-Ponce by stating 'based upon the whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.' Id. at 417. Cortez recognized that trained officers may draw inferences and deductions that might elude an untrained person.
 
 
 20
 INS argues that the district court erroneously rejected the principle of respecting the officers' expertise enunciated in Brignoni-Ponce and Cortez. As we read it, the preliminary injunction does no such thing. It merely requires officers to articulate their reasonable inferences and objective factors in making a stop. It prohibits stopping a vehicle solely on the grounds of the Hispanic appearance of the occupant. In conclusion, the preliminary injunction does not significantly 'tie the hands' of the INS. It is merely a prophylaxis against the unfair and humiliating treatment of Hispanics.
 
 
 21
 Accordingly, the judgment below is affirmed.
 
 
 22
 GUY, J., concurring.
 
 
 23
 My concurrence in this per curiam opinion is limited to my concluding that, on the basis of the record made before Judge Enslen at the preliminary injunction hearing, he was correct in deciding that plaintiffs had satisfied the four-pronged test of Mason County Medical Association v. Knebel, 563 F.2d 256 (6th Cir. 1977).
 
 
 24
 I believe it necessary to emphasize several additional points, however, First is the obvious fact that all we are dealing with here is a preliminary injunction. Judge Enslen did not elect to turn the preliminary injunction hearing into a trial of the issues presented. Fed. R. Civ. P. 65(a)(2). It is contemplated that there will be additional discovery before trial and additional proofs taken at trial. I would not want this opinion to be read as suggesting that the matter of INS search procedures is permanently resolved. The INS and the United States Border Patrol (USBP), in carrying out their almost impossible mission of illegal alien interdiction, have obviously tried to mold their operating procedures to conform to a strong congressional mandate as impacted by judicial decisions in the area of search and seizure.[1] To that end, they have developed an 'illegal alien profile' not unlike that relied upon by the Drug Enforcement Agency in its pursuit of illegal drug couriers, which profile has, at least in principle, passed judicial muster. If INS has foundered to date with its profile, it is not because such a profile is impermissible but, rather, because they have yet to put together the right ingredients to satisfy the requirements of the fourth amendment. To the degree that its profile comes up short, however, it is not because the factors it relies on are inappropriate--they are just inadequate.[2]
 
 
 25
 To that end, I am troubled with the conclusion that '[u]nreasonable searches and seizures, particularly when premised on race and alienage, are demeaning to such a degree as to be practically uncompensatable.' 'Race' and 'alienage' are precisely that about which the INS and the USBP are required to be concerned. Since it is undisputed that the single largest group of illegal aliens in the United States is of Hispanic origin, race and racial characteristics will always, of necessity, be part of any contemplated profile.
 
 
 26
 I am also hesitant and find it unnecessary at this juncture to endorse any distinctions being made about what the INS can or cannot do based upon geography--at least that geography that comprises western Michigan. It is my understanding that Michigan has the fourth largest seasonal migrant worker population in the United States, exceeded by only California, Texas, and Washington, and that migrant population is largely Hispanic. I do not believe it to be disputed that in any large population of migrant workers one will find illegal aliens. Therefore, the INS presence in western Michigan, where much of the migrant work force is concentrated, is both understandable and justified. That Michigan is 'thousands of miles from the Mexican border,' is not in and of itself conclusive on the issue of to what standards the INS should be held, or by what standard its searches should be tested.
 
 
 27
 I also find inappropriate the characterization of what has occurred here as 'unfair and humiliating treatment of Hispanics.' No one likes to be stopped by any authority figure if they haven't done anything wrong. However, Judge Enslen went out of his way to absolve the INS officers of any maltreatment connected with these confrontations:
 
 
 28
 My reading of the affidavits and exhibits has convinced me that immigration officials often go out of their way not to visit a hardship on Hispanic suspects. There is evidence that these officers grant extended departure visas, and similar deference to detainees. The fact that these officers perform within the bounds of humane discretion is, in fact, worthy of emphasis in this Opinion. It is also encouraging to recognize that the officers are very aware of case-law principles relating to their work.
 
 
 29
 Ramirez v. Webb, 599 F.Supp. 1278, 1289 (W.D. Mich. 1984). Since these plaintiffs also have unresolved damage claims, I am concerned about even inadvertently imparting a characterization to INS conduct supported neither by the record nor the trial judge's opinion.
 
 
 30
 Lastly, I would also indicate reservations relative to one of the requirements of the preliminary injunction. Judge Enslen has required the INS and USBP to 'identify the specific articulable facts leading to the stop to the person(s) stopped.' I am aware of no requirement of the fourth amendment nor any judicial gloss thereon which mandates such a procedure. This appears to me arguably to be privileged law enforcement information. Additionally, since Brignoni-Ponce allows as part of the reasonable suspicion equation the officers' 'previous experience with alien traffic,' 'recogniz[ing] the characteristic appearance of persons who live in Mexico' and 'assess[ing] the facts in light of his experience,' the preliminary injunction creates the possibility, if the INS literally complies, of turning a brief stop into a lengthy exposition of the officers' training, background, and experience. Since there is evidence in the record that, on occasion, the INS officers have stopped a vehicle and referenced some infraction of the law not within their jurisdiction as the reason for the initial stop, I would not find inappropriate a restriction on such stops--but I do not believe the 'articulate your reasons' approach is the best way to solve this problem.
 
 
 
 *
 Honorable Anna Diggs-Taylor, District Judge, U.S. District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 'Section 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. Sec. 1357(a)(1), authorizes any officer or employee of the Immigration and Naturalization Service (INS) without a warrant 'to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States.' There is no geographical limitation on this authority.' United States v. Brignoni-Ponce, 422 U.S. 873, 877 (1974) (emphasis added)
 
 
 [2]
 In comparing the Drug Enforcement Agency profile and the INS profile, I find striking similarities. I suspect that one significant difference between the judicial reception received by each lies less in intrinsic differences between the profiles than it does in differences in our societal attitudes toward drugs and illegal aliens. As a nation, we stand united in our war on drugs, but all branches of the Federal government, as well as the public, are ambivalent in our attitudes toward the illegal alien problem