Benjamin MURILLO, Isaac Villalva, David Renteria, Juan Carlos Jacquez, Hector Ortiz, Albert Vasquez, and Grace Hernandez, Individually, and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

Dale MUSEGADES, Border Patrol Sector Chief, Thirteen or More Unknown Agents of the El Paso Sector Border Patrol, All Individually and in Their Official Capacities, and the Immigration and Naturalization Service, Defendants.

No. EP–92–CA–319–B.

United States District Court,
W.D. Texas,
El Paso Division.

Dec. 1, 1992.

Amended Preliminary Injunction
Dec. 4, 1992.

Lee J. Teran, San Antonio, TX, Barbara Hines, Austin, TX, Albert Armendariz, Jr., El Paso, TX, Robert Frank Greenblum, Lawyer's Committee for Civil Rights, Immigrant & Refugee Rights Project, San Antonio, TX, for plaintiffs.

Nancy R. Gaines, U.S. Dept. of Justice, Trial Atty., Torts Branch, Civil Div., Allen W. Hausman, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUNTON, Senior District Judge.

BEFORE THIS COURT is Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum of Law in Support, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and Plaintiffs' Motion for Class Certification and Memorandum in Support, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, in the above-captioned cause. This Court held a hearing in El Paso, Texas on October 23, 1992 in which counsel for Plaintiffs and counsel for Defendants appeared and announced ready. At the hearing, the Motions and expedited Responses were heard, and the parties presented live testimony and numerous affidavits. Post-trial briefs and affidavits were submitted and accepted by the Court. Counsel for both parties are commended for accommodating this Court's tight schedule by presenting an expeditious hearing. In particular, counsel for the Government was placed under a tight preparatory time schedule. All jurisdictional and procedural prerequisites necessary for the maintenance of the claims of the parties are fulfilled. After considering the pleadings, the evidence presented, the deposition testimony, the proffered exhibits and numerous affidavits, the arguments of counsel, and the controlling legal authorities, this Court hereby enters its Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

This Court finds subject matter jurisdiction in the above-captioned cause pursuant to the provisions of 28 U.S.C. §§ 1331, 1343. Venue is proper because Plaintiffs reside in this judicial district. 28 U.S.C. § 1402(b).

## FINDINGS OF FACT

*The Litigation.*

1. The named individual Plaintiffs are United States citizens of Hispanic descent who are Residents of El Paso, Texas. Plaintiffs include students, graduates, and staff of Bowie High School, who reside, are employed, attend school, or travel within the Bowie High School District.

2. The named individual Plaintiffs ("Plaintiffs" or "representative Plaintiffs") moved this Court to certify them as the representatives of a class "consisting of all individuals of Hispanic descent, including students, graduates, and staff of Bowie

High School, who reside, are employed, attend school, and travel within the Bowie High School District, El Paso, Texas" (the "Plaintiff Class").

3. Defendant Dale Musegades is Sector Chief for the El Paso United States Border Patrol Sector (the "El Paso Border Patrol") of the Immigration and Naturalization Service (the "INS"), United States Department of Justice, and administers and enforces all immigration laws in the El Paso Sector. The named Defendants and Thirteen Unknown Border Patrol Agents are assigned to the El Paso Border Patrol and are responsible for enforcing immigration laws within the El Paso Border Patrol Sector.

*The Bowie High School Area.*

4. Bowie High School is located along the United States–Mexico border in what is considered the fourth most poverty-stricken area in the United States of America. The students primarily come from low socio-economic backgrounds. The vast majority of the residents within the Bowie High School District are of Hispanic descent.

*Plaintiffs' Fourth and Fifth Amendment Rights.*

5. During the morning of November 9, 1991, Plaintiff Benjamin Murillo, Coach of the Bowie High School football team, and Plaintiff Isaac Villalva and Cesar Soto, members of the Bowie High School varsity football team, drove to Jefferson High School to watch the junior varsity football game between Bowie High School and Jefferson High School. Two Defendant Unknown El Paso Border Patrol Agents in an El Paso Border Patrol vehicle stopped the car driven by Plaintiff Coach Murillo.

6. One of Defendant Unknown El Paso Border Patrol Agents approached the car and pointed a pistol at the head of Plaintiff Coach Murillo. Plaintiff Coach Murillo, wearing Bowie High School football coaching shorts and shirt, explained he was the football coach at Bowie High School. He further explained two of his football players were in the car with him and asked the Agent to holster his gun. Plaintiff Coach Murillo, understandably scared, testified he thought because Defendant Unknown El Paso Border Patrol Agent was pointing the gun at him he or the students were in immediate danger.

7. Coach Jaime Amezaga, an assistant football coach at Bowie High School who witnessed the El Paso Border Patrol stop, drove up and informed Defendant Unknown El Paso Border Patrol Agent they had stopped Plaintiff Murillo, a football coach at Bowie High School. Defendant Unknown Border patrol Agent turned toward Coach Amezaga and, while pointing the pistol at Coach Amezaga, informed Coach Amezaga the matter was none of his business.

8. Defendant Unknown El Paso Border Patrol Agent then searched Plaintiff Coach Murillo without his consent or probable cause.

9. While Plaintiff Coach Murillo was being interrogated, the other Defendant El Paso Border Patrol Agent questioned Plaintiff Isaac Villalva and Cesar Soto, forced them out of the car, and demanded they produce some identification. Plaintiff Isaac Villalva produced his United States military identification.

10. Plaintiff Isaac Villalva has been stopped and questioned by the El Paso Border Patrol several other times.

11. On June 3, 1992, Plaintiffs David Renteria and Juan Carlos Jacquez walked home from the rehearsal of their Bowie High School graduation ceremony. Two Defendant Unknown El Paso Border Patrol Agents stopped and detained Plaintiffs David Renteria and Juan Carlos Jacquez and asked questions concerning their citizenship status. In response to Defendant Unknown Agents' questions, Plaintiffs David Renteria and Juan Carlos Jacquez answered, in English, they were United States citizens.

12. Plaintiffs David Renteria and Juan Carlos Jacquez tried to walk home after answering Defendant Unknown Agents' questions twice. Defendant Unknown Agents shouted and threatened to harm them if they did not stop. Plaintiffs David Renteria and Juan Carlos Jacquez stopped

walking for fear of the consequences if they refused.

13. Defendant Unknown Agent grabbed Plaintiff David Renteria by the arm, turned him around, and shoved him into a fence, face first. Defendant Unknown Agent pushed his forearm against the back of Plaintiff David Renteria's neck, kicked his legs open, and began to smack him in the back and along the sides of his legs. Plaintiffs David Renteria and Juan Carlos Jacquez thought they were not free to go. Defendant Unknown Agents ridiculed Plaintiff David Renteria for exercising his constitutional rights.

14. Approximately two days after the June 3, 1992 incident, one of Defendant Unknown Agents drove by the home of Plaintiff David Renteria while he and his brother Dino Renteria were outside. Defendant Unknown Agent made an obscene gesture at the two boys, stuck his head out the window of the El Paso Border Patrol vehicle, laughed, and spit in their direction.

15. Plaintiff David Renteria and Dino have been stopped and harassed several times before by the El Paso Border Patrol.

16. During the Spring Semester of 1992, Plaintiff Hector Ortiz and a friend were given a ride to Bowie High School by Maria Flores and her brother in her brother's car. The driver and all three passengers were students at Bowie High School. All four students are of Hispanic descent. When they arrived at the Bowie High School parking lot at least three El Paso Border Patrol vehicles surrounded them, according to the Affidavit of Maria Flores.

17. Defendant Unknown El Paso Border Patrol Agents questioned the students as to their citizenship status. All of the students answered, in English, they were either United States citizens or legal permanent residents.

18. Defendant Unknown Agents forced the four students into El Paso Border Patrol vehicles, drove them down to the Santa Fe Bridge processing center, and detained them.

19. Plaintiff Hector Ortiz was taken out of the cell and interrogated by a Defendant Unknown El Paso Border Patrol Agent. Plaintiff Hector was not informed of his right to an attorney, his right to remain silent, or anything that anything he said could be used against him in a court of law. Defendant Unknown El Paso Border Patrol Agent returned Plaintiff Hector Ortiz to the cell. Several hours later, Plaintiff Hector Ortiz and the other students were released from detention.

20. On or about October of 1991, Plaintiff Grace Hernandez finished her work as a secretary at Bowie High School and went to the football stadium track to jog. After she finished jogging, she returned to her car, which was parked in the Bowie High School parking lot, and drove home.

21. As Plaintiff Grace Hernandez drove north an Cotton Street, an El Paso Border Patrol vehicle stopped her. Defendant Unknown El Paso Border Patrol Agents approached her car and questioned her in what she described as in a harsh tone.

22. Plaintiff Albert Vasquez, in May of 1992, was at the outdoor handball courts at Bowie High School with friends, according to his Affidavit. Plaintiff Albert Vasquez was playing handball. Two Defendant Unknown El Paso Border Patrol Agents came around the courts to grab Plaintiff Albert Vasquez' arm while he was playing handball.

23. Plaintiff Albert Vasquez, on October 8, 1992 at about 10:00 p.m., was with a friend walking in the Bowie High School District. An El Paso Border Patrol vehicle pulled up to them and the Agent asked them where they were born and where they were going. Both Plaintiff Albert Vasquez and his friend answered all the questions in English.

24. Plaintiff Albert Vasquez and a friend, on October 11, 1992, at about 12:00 noon, left home to walk down a street located in the Bowie High School District. An El Paso Border Patrol vehicle drove past them in the opposite direction, turned around, and stopped them.

25. Although Plaintiff Albert Vasquez and his friend attempted to walk on, a Defendant Unknown El Paso Border Patrol

Agent shouted and grabbed Plaintiff Albert Vasquez' arm and questioned him about his place of birth and destination. Plaintiff Albert Vasquez chose not to answer Defendant Unknown Agent or produce any identification.

26. Plaintiff Albert Vasquez has been stopped many times by the El Paso Border Patrol in the Bowie High School area. Often he would be outside of his home with friends and the El Paso Border Patrol will stop him and ask him for his citizenship. The stops frequently happen on Sundays and sometimes once a week.

27. Representative Plaintiffs, all United States citizens, have been insulted, humiliated, degraded, and embarrassed each time they were unlawfully either stopped, questioned, detained, frisked, arrested, searched, or physically or verbally abused by Defendants. Representative Plaintiffs are afraid they will be stopped, questioned, detained, frisked, arrested, searched, and physically and verbally abused by Defendants in the future without legal cause.

28. The overriding reason Representative Plaintiffs have been, or will be in the future, stopped, questioned, detained, frisked, arrested, searched, and physically and verbally abused by Defendants is of their mere appearance of being from Hispanic descent.

*Persons Similarly Situated to Representative Plaintiffs.*

29. Members of the putative Plaintiff Class are all other persons similarly situated to representative Plaintiffs who are United States citizens or legal permanent residents "of Hispanic descent, including students, graduates, and staff of Bowie High School, who reside, are employed, attend school, and travel within the Bowie High School District, El Paso, Texas."

30. During May of 1992, Marcela De Leon and a friend walked home from school, according to her Affidavit. An El Paso Border Patrol stopped and questioned them.

31. On October 18, 1992, Marcela De Leon was again stopped and questioned by an El Paso Border Patrol Agent as she walked home from Bowie High School. Marcela De Leon was embarrassed and insulted because she was required to prove her United States citizenship.

32. Some years ago in the summer, Nieden Susie Diaz walked home alone from school, according to her two Affidavits. An El Paso Border Patrol vehicle pulled up near her. The El Paso Border Patrol Agent on the driver's side of the Patrol vehicle got out and approached her. The Agent demanded to know her citizenship and questioned her. Nieden Susie Diaz answered all of his questions in English.

33. The El Paso Border Patrol Agent for no apparent reason knocked Nieden down to the ground and kicked her about twenty times. Nieden Susie Diaz was bruised, in physical pain, and embarrassed and humiliated by this experience. The incident was not the first time she had been detained by the El Paso Border Patrol.

34. Gabriel Garcia was a member of the Bowie High School cross-country track team. According to his Affidavit, during November of 1991 he was running as part of his practice for the team. Gabriel Garcia was wearing "Bowie High" sweats. An El Paso Border Patrol Agent stopped him and repeatedly asked what he was doing and about his citizenship. Gabriel Garcia explained he was training for the Bowie High School cross-country track team, and he was a legal permanent resident of the United States. The Agent angrily demanded Gabriel Garcia prove his citizenship status.

35. In October or November of 1991, Beatriz Adriana Guzman's Godmother drove her home from Bowie High School, according to her Affidavit. An El Paso Border Patrol vehicle stopped the car. Two El Paso Border Patrol Agents approached the car and harshly ordered Beatriz Adriana Guzman to get out of the car. She was intimidated by the El Paso Border Patrol Agent and did as she was ordered because she thought she had no other choice. The Agents demanded the production of some identification from Beatriz Adriana Guzman and her Godmother.

494

36. During September of 1992, Ernie Munoz walked to classes at Bowie High School, according to his Affidavit. An El Paso Border Patrol vehicle drove up beside him and Ernie Munoz stopped walking. The El Paso Border Patrol Agent demanded to search Ernie Munoz' backpack and questioned him as to his citizenship.

37. In March or April of 1992, Nidia Rodriguez was on her way home from Bowie High School and was approached by a speeding El Paso Border Patrol vehicle, according to her Affidavit. The El Paso Border Patrol Agents stopped her and angrily questioned her regarding her citizenship. Nidia Rodriguez feared she would be physically hurt by the Agents, and thought the only reason she was stopped was because her skin was "brown."

38. In December of 1991, on a school day, Danny Rojas and his cousin walked home from school, according to his Affidavit. Danny Rojas was born in Watseka, Illinois, more than a stones' throw from the Mexican–American Border, and she currently resides in El Paso. As Danny Rojas and his cousin walked from Bowie High School, an El Paso Border Patrol vehicle approached and stopped about three feet away from them. The El Paso Border Patrol Agent who was driving yelled at them to stop. The Agent repeatedly questioned them as to their citizenship status. Danny and his cousin explained they were United States citizens.

39. In the summer of 1991, Mario Tapia and a friend witnessed an El Paso Border Patrol Agent stop an unidentified man and beat the man with a billy stick, according to Mario Tapia's Affidavit. The beating took place about fifteen to twenty feet away from Mario Tapia and his friend. When Mario Tapia and his friend came to the aid of the man, Mario Tapia and his friend were beaten by the El Paso Border Patrol Agents. Mario Tapia was hit at least four times, once in the face, once in the head, and twice near his stomach.

40. During the summer of 1992, an El Paso Border Patrol vehicle approached Mario and his friend and demanded to know Mario Tapia's citizenship. Mario Ta-

pia did not think he was free to go. Both Mario Tapia and his friend answered they were United States citizens. The Agents continued to question Mario Tapia and his friend and verbally abused them, using profanity.

41. In March or April of the 1991–92 school year, Ricardo Vielma left Bowie High School to walk to his home located near the school, according to his Affidavit. While he was walking across the school parking lot, an El Paso Border Patrol vehicle stopped and yelled for Ricardo Vielma to come to them. The El Paso Border Patrol Agents asked his about his citizenship status, and Ricardo Vielma answered in English. The Agents asked him what was in the gym bag he was carrying. When Ricardo Vielma responded nothing, one Agent pushed him against the vehicle and the other grabbed for the bag. The Agents searched the bag, frisked Ricardo Vielma, threw the bag at him, and told him to get out of here.

42. About five years ago, Alfred M. Silva and his staff were preparing the Bowie High School baseball infield. Alfred M. Silva is a baseball coach, according to his Affidavit. An El Paso Border Patrol vehicle drove onto the campus, jumped the curb, and drove down center and left field. Alfred M. Silva stopped the vehicle and queried the El Paso Border Patrol Agent if driving up and destroying the infield of the baseball diamond was necessary. Without explaining the reason for driving on the infield, the Agent responded he was looking for three large trash bags filled with marijuana, and he simply drove away.

43. On November 9, 1991, Bill Schmidt, a teacher and coach at Bowie High School, was driving in his vehicle with Coach Jaime Amezaga, according to his Affidavit. The two were going from Bowie High School to Jefferson High School to watch a junior varsity football game. They were following behind the car owned by Coach Tom Lowry, a Bowie High School coach, and driven by Coach Murillo. Bill Schmidt noticed an El Paso Border Patrol vehicle behind him with its lights flashing. He pulled over, but the El Paso Border Patrol

vehicle stopped Coach Murillo's car after passing Bill Schmidt's vehicle. Although some time lapsed, Bill Schmidt parked his vehicle and walked over to Coach Murillo's car. When Bill Schmidt and Coach Amezaga arrived, the El Paso Border Patrol Agent seemed upset and irritated at their arrival on the scene.

44. The above individuals, similarly situated to representative Plaintiffs, all United States citizens and legal permanent residents of Hispanic descent, have been insulted, humiliated, degraded, and embarrassed each time they were either stopped, questioned, detained, frisked, arrested, searched, or physically or verbally abused by Defendants. They are afraid they will be stopped, questioned, detained, frisked, arrested, searched, and physically and verbally abused by Defendants in the future without legal cause.

45. The overriding reason these individuals have been, or will be in the future, stopped, questioned, detained, frisked, arrested, searched, and physically and verbally abused by Defendants is because of their mere appearance as being of Hispanic descent.

*Bowie High School Campus and Surrounding Area.*

46. The El Paso Border Patrol has a regular, consistent, and prominent presence on the Bowie High School campus, whether their presence be by parking in the parking lots, speeding along the service roads, jumping across the curbs, or driving across concrete sidewalks and grassy areas. The El Paso Border Patrol's presence is further made known by their driving over the football practice field and baseball diamond, entering the football locker rooms, surveilling with binoculars from the football stadium, and using binoculars to watch flag girls practicing on campus.

47. Bowie High School provides an oasis of safety and freedom for the students and staff who reside within the School District. The continued harassment of Bowie High School students and staff by the El Paso Border Patrol is both an invasion of their civil rights and the oasis.

*Injunction Ordered by This Court in Mendoza v. INS.*

48. Although he has heard about the injunction or opinion issued in *Mendoza v. INS,* 559 F.Supp. 842, 850 (W.D.Tex.1982), El Paso Border Patrol Sector Chief Dale Musegades has not read the injunction or opinion. Defendant Musegades has done nothing to implement or monitor compliance with the terms of the injunction.

49. The El Paso Border Patrol does not keep statistics on the number of United States citizens or legal permanent residents it stops, detains, questions, frisks, searches, arrests, and releases. The records produced by the El Paso Border Patrol and the testimony given by Defendant Musegades contain at least questionable, possibly inflated, and apparently inconsistent statistics regarding the number of aliens unlawfully present in the United States who are arrested in the Bowie High School District. *See* Defendants' Exhibit 4.

50. Defendant Musegades is aware of complaints by students and residents of the Bowie High School District regarding El Paso Border Patrol abuses. In May of 1992, Civil Rights Commission hearings were held in El Paso, Texas and El Paso Border Patrol abuses were aired.

51. Defendant Musegades claims he is not responsible for any alleged abuses by El Paso Border Patrol Agents unless and until the abuses are properly reported. Defendant Musegades has done nothing to remedy the Fourth Amendment violations reported to him, although he testified if the allegations are true, they are "intolerable."

52. The El Paso Border Patrol does not comply with the policy issued by A.H. Giugni, District Director of the INS Service El Paso District, which states "that all law enforcement activities at all levels and types of schools is prohibited unless prior approval has been granted as provided...." Defendants' Exhibit 3. Although the policy warns "[f]ailure to comply with this policy will lead to appropriate disciplinary action," Defendants produced no evidence of disciplinary actions for policy violators.

*System for Reporting El Paso Border Patrol Abuses.*

53. The procedures presently in place for reporting and investigating alleged abuses by the El Paso Border Patrol are ineffective. The procedures are complex and often the victim of abuse is discouraged from filing a complaint by the governmental offices, personnel, and complaint structure.

54. Victims of abuse by the El Paso Border Patrol fail to report the abuse because: (1) victims fear retaliation by the INS and by the El Paso Border Patrol in the form of deportation, criminal charges, or loss of legal immigration status for themselves or family members; (2) victims begrudgingly accept this type of abusive law enforcement action as a way of life; (3) victims have a sense of futility in filing grievances as victims are rarely, if ever, informed of the disposition of their complaints; and (4) victims believe the complaints will neither be rigorously investigated nor officers duly disciplined.

55. Juan Hilario Sybert Coronado is a teacher at Bowie High School. On May 19, 1992, Juan Sybert Coronado observed two male El Paso Border Patrol Agents in their vehicle, which was parked on the lawn behind the Bowie High School administration building. The Agents were using a pair of binoculars to watch groups of female students as they left school. Juan Sybert Coronado attempted to complain about the incident to the El Paso Border Patrol office at the International Cordova Bridge in El Paso, Texas. No one was available to take the complaint. Juan Sybert Coronado then wrote a letter concerning the incident. To date, Juan Sybert Coronado has received no response to his written complaint. *See* Plaintiffs' Exhibit 14.

56. In excess of 800 Bowie High School students and employees signed a petition which was delivered to United States Congressman Ron Coleman asking the El Paso Border Patrol to repair and maintain the holes in the border fence south of Bowie High School. The fence separates Bowie High School from the Republic of Mexico. The petition implored the El Paso Border Patrol to discontinue using the Bowie High School campus to trap people who were illegally entering the United States from Mexico. The holes in the border fence have existed for at least fifteen to sixteen years. *See* Plaintiffs' Exhibit 14.

*The Gentlemens' Agreement.*

57. In response to a public hue and cry to abuses by the El Paso Border Patrol in the Bowie High School area, the Superintendent of the El Paso Independent School District was forced to address the complaints from students and personnel of Bowie High School. On October 19, 1992, the terms of a "Gentlemens' Agreement" between Defendant Dale Musegades and Dr. Stan Paz, Superintendent of the El Paso Independent School District, were announced from the offices of United States Representative Ron Coleman. The agreement provides only for a system where reports of El Paso Border Patrol abuse of Bowie High School students while on campus will be reported to the office of Dr. Stan Paz.

58. The agreement does not address any method for prohibiting future abuses by the El Paso Border Patrol of Bowie High School students. The agreement does not address remedying any prior abuses of Bowie High School students' Fourth Amendment rights, or any other rights, by El Paso Border Patrol Agents. The agreement does not address any violations committed by the El Paso Border Patrol which occur off of the Bowie High School campus. The agreement does not affect those people who are not students, yet who are Hispanic and reside in or travel through the Bowie High School District and whose rights are violated by the El Paso Border Patrol.

59. Whatever system for after the fact complaints is in place, it cannot usurp the constitutional rights of Plaintiffs. The El Paso Border Patrol has other means of patrolling the border area near Bowie High School which will not infringe on Plaintiffs' constitutional rights.

60. Defendants could patrol the international boundary on the south side of Bowie High School and maintain high visibility

surveillance on the levee on a regular basis, rather than station El Paso Border Patrol Agents north of, in, and around the Bowie High School campus.

## CONCLUSIONS OF LAW

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION.

### Standard.

■ 1. To show entitlement to a preliminary injunction, movants must establish each of the following: (1) a substantial threat the failure to grant the injunction will result in irreparable injury to movants; (2) the threatened injury to movants outweighs any damages the injunction may cause to non-movants; (3) the injunction will not disserve the public interest; and (4) a substantial likelihood movants will prevail on the merits of their claim. *Allied Mktg. Group, Inc. v. CDL Mkt., Inc.,* 878 F.2d 806, 809 (5th Cir.1989); *see Black Fire Fighters Ass'n v. City of Dallas,* 905 F.2d 63, 65 (5th Cir.1990); *Blue Bell Bio–Medical v. Cin–Bad, Inc.,* 864 F.2d 1253, 1256 (5th Cir.1989); *Buchanan v. United States Postal Serv.,* 508 F.2d 259, 266 (5th Cir. 1975). In the Fifth Circuit, injunctive relief is an "extraordinary and drastic remedy" which should be granted only when a movant clearly carries the burden of persuasion on all four elements. *Black Fire Fighters Ass'n,* 905 F.2d at 65; *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985); *Canal Authority v. Callaway,* 489 F.2d 567, 573 (5th Cir.1974). The heavy burden of proof in justifying an injunction is *wholly* on the movant. *See Hardin v. Houston Chronicle Publishing Co.,* 572 F.2d 1106, 1107 (5th Cir.1978) (per curiam). The non-moving party bears no burden to defeat the motion. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 442–43, 94 S.Ct. 1113, 1125–26, 39 L.Ed.2d 435 (1974). "Thus, if the movant does not succeed in carrying [the] burden on any one of the four prerequisites, a preliminary injunction may not issue...." *Enterprise Int'l, Inc.,* 762 F.2d at 472; *see Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430,

435 (5th Cir. Unit B 1981). "The granting or denying of a preliminary injunction rests in the sound discretion of the [D]istrict [C]ourt." *Clements Wire & Mfg. Co. v. NLRB,* 589 F.2d 894, 897 (5th Cir.1979).

### Irreparable Injury.

■ 2. Irreparable injury is established upon movants showing constitutionally protected rights have been violated. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984); *Mendoza v. INS.,* 559 F.Supp. 842, 850 (W.D.Tex.1982). Plaintiffs demonstrated their rights to protection under the Fourth and Fifth Amendments were violated. Further, Plaintiffs presented ample evidence showing violations will likely continue to occur. The process for accepting and resolving complaints against INS abuse, including the oral agreement between the El Paso Border Patrol and the Bowie High School District Superintendent, is wholly inadequate to curtail future abuses. Irreparable injury was established.

### Balance of Interests.

3. The balance of hardships favors entry of preliminary relief in favor of Plaintiffs. The Government's interest in enforcing immigration laws does not outweigh the protection of the rights of United States citizens and permanent residents to be free from unreasonable searches and seizures. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 882–83, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975); *see also Illinois Migrant Council v. Pilliod,* 540 F.2d 1062, 1071 (7th Cir.1976), *modified,* 548 F.2d 715 (7th Cir.1977) (en banc); *Mendoza,* 559 F.Supp. at 850. Other means are available to the El Paso Border Patrol to enforce immigration law without resort to wholesale violations of the Fourth and Fifth Amendment rights of students and residents of the Bowie High School District.

### Public Interest.

4. The public interest will be served by protection of Plaintiffs' constitutional rights. *See, e.g., Electronic Data Sys. Corp. Iran v. Social Sec. Org. of Gov't of Iran,* 508 F.Supp. 1350, 1358 (N.D.Tex.

1981). Respect for Plaintiffs' constitutional rights is of paramount importance; otherwise, the vast majority of the population within the Bowie High School District, which is Hispanic, will continue to be subject to illegal stops, questioning, detentions, frisks, arrests, searches, and further abuses by the El Paso Border Patrol. *Mendoza*, 559 F.Supp. at 850–51.

5. In addition, the public interest is served when students and their teachers are free from undue interference from law enforcement officers. Education is of " 'supreme importance' " and the " 'most vital civic institution for the preservation of a democratic system of government.' " *Plyler v. Doe*, 457 U.S. 202, 221, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 400, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923); *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 230, 83 S.Ct. 1560, 1576, 10 L.Ed.2d 844 (1963)).

*Substantial Likelihood of Success on Merits.*

6. Plaintiffs have shown a substantial likelihood of success on the merits of all their claims. Plaintiffs have been subjected to violations of the Fourth and Fifth Amendments. Plaintiffs have been, based on their Hispanic appearance, repeatedly stopped, questioned, detained, frisked, searched, and arrested without legal cause, and have been subjected to verbal and physical abuse.

▇ 7. The Immigration and Nationality Act (the "INA") allows an INS Agent to question a person, believed to be an alien, about his or her "right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). The statutory provision *is limited* by the Fourth Amendment. An INS Agent may not question any individual as to his or her right to be or to remain in the United States unless the INS Agent has a reasonable suspicion, based on specific articulable facts involving more than mere ethnic appearance, that the individual is an alien. *Brignoni–Ponce*, 422 U.S. at 877–78, 884, 95 S.Ct. at 2578, 2581–82; *Pilliod*, 540 F.2d at 1066; *Au Yi Lau v. INS*, 445 F.2d 217, 223 (D.C.Cir.1971), *cert. denied*, 404 U.S.

864, 92 S.Ct. 64, 30 L.Ed.2d 108; *Ramirez v. Webb*, 599 F.Supp. 1278, 1282 (W.D.Mich. 1984), *aff'd*, 787 F.2d 592 (6th Cir.1986); *Mendoza*, 559 F.Supp. at 847–48.

▇ 8. Questioning with reasonable suspicion of alienage is permissible so long as the INS Agent does not restrain the individual, and the individual reasonably believes he or she is free to walk away. Although it would be indicative of common respect and courtesy, the individual is not required to be cooperative in such a situation. The INS Agent *must have* a reasonable suspicion of illegal alienage in order to detain or "seize" a person for interrogation. *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *Brignoni–Ponce*, 422 U.S. at 878, 95 S.Ct. at 2578; *Mendoza*, 559 F.Supp. at 846; *see also, INS v. Delgado*, 466 U.S. 210, 216–20, 104 S.Ct. 1758, 1762–64, 80 L.Ed.2d 247 (1984); *Pilliod*, 540 F.2d at 1070–71 n. 10; *Au Yi Lau v. INS*, 445 F.2d at 223. " [W]henever a police officer accosts an individual and restrains his [or her] freedom to walk away, he has 'seized' that person,' ... and the Fourth Amendment requires that the seizure be 'reasonable.' " *Brignoni–Ponce*, 422 U.S. at 878, 95 S.Ct. at 2578 (quoting *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968)).

▇ 9. An INS Agent may not detain to investigate the alien status of any individual without the necessary reasonable suspicion. Investigative detention with reasonable suspicion of illegal alienage is permissible so long as the detention does not last any longer than necessary to determine whether or not the individual is an alien illegally in the United States. *Brignoni–Ponce*, 422 U.S. at 881, 95 S.Ct. at 2580; *Mendoza*, 559 F.Supp. at 848. Furthermore, the INS Agent may not frisk any individual who has not been arrested unless the INS Agent has a reasonable suspicion, based on specific articulable facts, the individual is armed.

▇ 10. When an individual is stopped *solely* for purposes of being identified, the individual has the right to decline

to answer a law enforcement officer's questions. *Brown v. Texas*, 443 U.S. 47, 52–53, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). Even when a person refuses an officer's request for identification, the officer must have a reasonable suspicion of misconduct in order to detain him or her. *Id.* at 52, 99 S.Ct. at 2641; *see also Delgado*, 466 U.S. at 216–17, 104 S.Ct. at 1762–63; *Delgado*, 466 U.S. at 228–29, 104 S.Ct. at 1769 (Brennan, J. concurring in part and dissenting in part); *Royer*, 460 U.S. at 497–98, 103 S.Ct. at 1324 (plurality opinion); *Royer*, 460 U.S. at 511–12, 103 S.Ct. at 1331–32 (Brennan, J. concurring in result); *Royer*, 460 U.S. at 514, 103 S.Ct. at 1333 (Blackmun, J. dissenting). Moreover, no inference of suspicious conduct may be drawn from a refusal to cooperate. *See Delgado*, 466 U.S. at 216–17, 104 S.Ct. at 1762–63.

■■■ 11. Although the El Paso Border Patrol has the right to patrol automobiles in border areas, its actions are circumscribed by the United States Constitution. *See Brignoni–Ponce*, 422 U.S. at 877, 95 S.Ct. at 2578 (quoting *Almeida–Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973)). Thus, the INS may only stop a vehicle only when an officer "is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Brignoni–Ponce*, 422 U.S. at 884, 95 S.Ct. at 2582; *see also United States v. Shute*, 402 F.Supp. 1353, 1355–56 (W.D.Tex.1975). "The existence of reasonable suspicion depends on the facts known to the agent at the time the stop is made, not at the moment the agent decides to make the stop." *United States v. Boruff*, 909 F.2d 111, 117 (5th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1620, 113 L.Ed.2d 718 (1991). In *Brignoni–Ponce*, the Supreme Court delineated several factors for determining reasonable suspicion.

These factors include: (1) characteristics of the area in which the vehicle is encountered; (2) proximity to the border; (3) usual patterns of traffic on the road; (4) previous experience with alien traffic; (5) information about recent illegal crossings in the area; (6) behavior of the driver; (7) appearance of the vehicle; and (8) number, appearance and behavior of the passengers.

*United States v. Melendez–Gonzalez*, 727 F.2d 407, 410–11 (5th Cir.1984) (citing *Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2582). Therefore, an INS Agent may not stop any vehicle to question any individual regarding his or her right to be or remain in the United States, unless the INS Agent has a reasonable suspicion based on specific articulable facts involving more than mere ethnic appearance that the vehicle contains aliens illegally in the United States. *Brignoni–Ponce*, 422 U.S. at 884, 95 S.Ct. at 2582. The INS Agent "may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *Id.* at 881–82, 95 S.Ct. at 2580.

■■■ 12. While the determination of reasonableness must be made on a case-by-case basis, certain guidelines apply by which to measure an INS Agent's actions. As a salient guideline, a search or seizure will *never* be considered reasonable if the officer stops the vehicle *solely because of the Mexican ancestry of the occupant.* *See Brignoni–Ponce*, 422 U.S. at 885–87, 95 S.Ct. at 2582–83; *Ramirez*, 599 F.Supp. at 1283.

■■■ 13. The general rule regarding permissible searches is also founded on the principles of the Fourth Amendment. "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of a traditional arrest." *Brignoni–Ponce*, 422 U.S. at 877, 95 S.Ct. at 2578. Thus, an INS Agent also must have probable cause to believe the search will uncover evidence relating to illegal activities. *See Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *United States v. Espinoza–Seanez*, 862 F.2d 526, 533 (5th Cir.1988). An INS Agent may not search, without a warrant, any individual or his or

her belongings or his or her vehicle, unless the search is made a pursuant to a lawful arrest or unless the search is necessary to prevent the destruction of evidence and then only if there is probable cause to search. *Chambers*, 399 U.S. at 51, 90 S.Ct. at 1981.

14. The INS is held to the standard of "probable cause" when one of its Agents arrests an individual without a warrant. *Brignoni–Ponce*, 422 U.S. at 882 n. 7, 95 S.Ct. at 2580 n. 7; *Yam Sang Kwai v. INS*, 411 F.2d 683, 687 (D.C.Cir.), *cert. denied*, 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1969); *Mendoza*, 559 F.Supp. at 849; *see also Royer*, 460 U.S. at 498, 103 S.Ct. at 1324. In addition, a warrant is required unless the individual is likely to flee before an arrest warrant can be obtained. 8 U.S.C. § 1357(a)(2). The INS cannot arrest, without a valid warrant of arrest, any individual for a violation of the immigration laws as to whom the INS Agent does not have probable cause to believe that he or she is present in the United States illegally, or is guilty of committing an offense relating to the immigration laws, and then only if the individual is likely to escape before the INS Agent can obtain a warrant of arrest. *Id.*

15. In the course of a stop, arrest, or other seizure, a law enforcement officer may not use unreasonable and excessive force. The Fourth Amendment protects individuals from physically intrusive behavior during an arrest. *See Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir.1989) (en banc); *Hay v. City of Irving*, 893 F.2d 796, 798 (5th Cir.1990) (per curiam).

16. A central purpose of the Equal Protection Clauses of the United States Constitution is the prevention of discrimination against individuals because of membership in a protected class. *See Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The stopping, questioning, detaining, frisking, arresting, and searching of individuals based *solely* upon racial and ethnic appearance reprehensibly violates the Fifth Amendment. The INS cannot subject United States citizens and permanent residents to stops, questioning, detentions, searches, arrests, verbal and physical abuses, harassment, and humiliation based upon the citizens' and residents' mere Hispanic appearance. *See Johnson*, 876 F.2d at 479.

17. A review of the actions of the INS and its Agents in this case demonstrates Defendants violated Plaintiffs' Fourth Amendment rights. Defendants did not have a reasonable suspicion of either alienage or illegal alienage when any of Plaintiffs or members of the putative Plaintiff Class were initially stopped and questioned by INS Agents. For example, the stops and questioning of Plaintiff Coach Benjamin Murillo, who was accompanied by two of his football players, were not based on reasonable suspicion. The stops and questioning of Plaintiffs Grace Hernandez, the school secretary, and numerous students, who were simply leaving school to return to their homes, were not based on reasonable suspicion. Even assuming there was a remote reason for the stops of the Bowie High School students and staff, there was no cause for the detentive questioning which followed each stop. Most Plaintiffs answered the initial questions of the INS and unequivocally stated in English they were legally present in the United States. Plaintiffs' answers served to overcome any "reasonable suspicion" the INS may claim it had and precluded the INS from any further inquiries, detentions, frisks, arrests, searches, physical and verbal abuses, or threats. Defendants lacked probable cause either to arrest Plaintiff Hector Ortiz or to search the belongings of a Plaintiff or other witness.

18. The El Paso Border Patrol's use of excessive force is a further intrusion into Plaintiffs' Fourth Amendment rights. No justification existed for the force used against numerous Plaintiffs and witnesses. For example, there is no evidence which supports any reason for an INS Agent either to push Plaintiff David Renteria's face against a fence or to kick Plaintiff Nieden Susie Diaz, or to point a loaded

weapon at the head of Plaintiff Coach Benjamin Murillo.

19. The INS in this case discriminated against Plaintiffs in violation of their Fifth Amendment rights to equal protection. The INS has repeatedly and illegally stopped, questioned, detained, frisked, arrested, and searched Plaintiffs and numerous other students from the Bowie High School District. El Paso Border Patrol Agents have subjected Plaintiffs and others to indecent comments, obscene gestures, and humiliation in the presence of their co-workers, friends, family, and relevant community. The proffered evidence strongly supports this Court in its conclusion that the illegal and abusive conduct of the El Paso Border Patrol was directed against Plaintiffs, staff, and residents in the Bowie High School District *solely* because of their mere immutable appearances as Hispanics.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION.

*Standard.*

■ 20. Under Rule 23(a), a class action is maintainable

only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *see Estate of Remley v. Amoco Prod. Co.,* 100 F.R.D. 419, 420 (S.D.Tex.1983). In short, the four requirements are numerosity, commonality, typicality, and adequacy of representation.

21. In addition to the Rule 23(a) requirements, the action must satisfy the standards for at least one of the three types of class suits listed in Rule 23(b): (1) where the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent, varying, or prejudicial adjudications; (2) where a class may appropriately seek injunctive or declaratory relief; or (3) where common questions of law or fact predominate and a class action is superior to other available methods of adjudication. *See* Fed.R.Civ.P. 23(b); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 2145, 40 L.Ed.2d 732 (1974). Plaintiffs argue this action is appropriately maintainable as a class action pursuant to Rule 23(b)(2).

■ 22. Movants have the burden of demonstrating the propriety of class certification. *Fleming v. Travenol Lab., Inc.,* 707 F.2d 829, 832 (5th Cir.1983). A class action may only be certified if the District Court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). "The decision to grant or to deny class certification is ... initially committed to the sound discretion of the [D]istrict [J]udge, and the decision will not be overturned except for abuse of discretion." *Horton v. Goose Creek Indep. School Dist.,* 690 F.2d 470, 483 (5th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983). In making a decision, the District Judge "must bear in mind the impact of a binding judgment on class members and the functions of the class action in facilitating assertion of certain types of claims or defenses and in avoiding repetitious litigation." *Id.*

■ 23. All four conjunctive prerequisites of Rule 23(a) must be satisfied in order to maintain a class action. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 2145, 40 L.Ed.2d 732 (1974). The purpose of the prerequisites is to "limit the class claims to those fairly encompassed by the named [P]laintiffs' claims." *Falcon,* 457 U.S. at 156, 102 S.Ct. at 2370. Where the difficulties in maintaining a class action outweigh the benefits, it is within the Court's discretion to deny certification of the class. *See Shumate & Co. v. National Ass'n of Sec. Dealers, Inc.,* 509 F.2d 147, 155 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975). Therefore, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* (quoting *East Tex.*

*Motor Freight Sys., Inc. v. Rodriquez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1976)).

24. In their Motion for Class Certification, Plaintiffs ask the Court for permission to represent the class "consisting of all individuals of Hispanic descent, including students, graduates, and staff of Bowie High School, who reside, are employed, attend school, and travel within the Bowie High School District, El Paso, Texas" (the "Plaintiff Class").

*Numerosity.*

■ 25. With respect to numerosity, "[t]he basic question is practicability of joinder, not number of interested persons per se. Practicability of joinder depends on size of the class, ease of identifying its members and determining their addresses, facility of making service on them if joined[,] and their geographic dispersion." *Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981).

26. The vast majority of the students are of Hispanic descent, as are families and Bowie High School graduates who reside within the Bowie High School District. Many of the putative class members, confined to the Bowie High School District, are identifiable for purposes of making service. The identification and service of these individuals will require some significant efforts by the Plaintiffs. However, the putative class contains prospective members, who may be harmed by Defendants' policies and practices in the future. By definition, the identities of these putative members are unknown. *See Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1022 (5th Cir. 1981) (" 'joinder of unknown individuals is certainly impracticable' ") (quoting *Jack v. American Linen Supply Co.,* 498 F.2d 122, 124 (5th Cir.1974) (per curiam)). The Court is of the opinion the potentially large number of class members, approximately 2037, are geographically dispersed in a manner which makes joinder impracticable. In addition to the present putative class members, the fact Plaintiffs seek declaratory and injunctive relief on behalf of future members increases the size of the proposed class. *See Jones v. Diamond,* 519 F.2d 1090, 1100 (5th Cir.1975).

*Commonality and Typicality.*

27. Further review reveals further grounds upon which this Court bases its grant of Plaintiffs' Motion for Class Certification.

The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. at 2370–71 n. 13.

28. The named Plaintiffs allege the putative class member have been, are being, or are subject to stops, questioning, detentions, frisks, arrests, searches, excessive force, and harassment by Defendants. The claims of the Plaintiffs are typical of the claims of the putative Plaintiff Class.

*Adequacy of Representation.*

■ 29. The adequacy of representation requirement "raises concerns about the competency of class counsel and conflicts of interest." *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. at 2370–71 n. 13; *see General Tel. Co. v. EEOC,* 446 U.S. 318, 331, 100 S.Ct. 1698, 1706–07, 64 L.Ed.2d 319 (1980). "Adequate representation basically requires inquiry into three areas: (1) the qualifications of [P]laintiffs' attorney, (2) the possibility that the litigants are involved in a collusive suit[,] and (3) whether the named [P]laintiffs have interests antagonistic to those of the rest of the class." *Parker v. Bell Helicopter Co.,* 78 F.R.D. 507, 512 (N.D.Tex.1978) (citing *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122 (5th Cir.1969)); *see also North Am. Acceptance Corp. Sec. Cases v. Arnall,*

*Golder & Gregory,* 593 F.2d 642 (5th Cir.), *cert. denied,* 444 U.S. 956, 100 S.Ct. 436, 62 L.Ed.2d 328 (1979).

30. No indicators are before this Court which express any concern with respect to any of these three inquiries. The Plaintiffs will fairly and adequately protect the interests of the putative members of the Plaintiff Class because they have been and are currently being similarly treated. Plaintiffs have no conflict with the members of the putative class, and they are represented by competent and experienced counsel.

31. The relief Plaintiffs seek is precisely the type of remedial action for which Rule 23(b)(2) was designed. *See Penson v. Terminal Transp. Co.,* 634 F.2d 989, 993 (5th Cir.1981).

32. Any conclusion of law more properly characterized as a finding of fact is adopted as such. Any finding of fact more properly characterized as a conclusion of law is adopted as such.

IN ACCORDANCE WITH the foregoing Findings of Fact and Conclusions of Law, the Court will enter its specific Order Granting both Plaintiffs' Motion for Preliminary Injunction in the above-captioned cause in favor of Plaintiff Class in accordance with Rule 65(d) of the Federal Rules of Civil Procedure and Plaintiffs' Motion for Class Certification pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

## ORDER GRANTING PRELIMINARY INJUNCTION AND CLASS CERTIFICATION

The Court having heard evidence and arguments of counsel in support of and in opposition to Plaintiffs' Motion for Preliminary Injunction and to Plaintiffs' Motion for Class Certification on October 23, 1992 and having filed appropriate Findings of Fact and Conclusions of Law, enters the following Orders:

IT IS ORDERED Plaintiffs' Motion for Class Certification in the above-captioned cause is GRANTED. Representatives of Plaintiff Class shall inform the Court within twenty (20) days of the filing of this Order how they intent to identify and to notify the members of the Plaintiff Class for purposes of making adequate service.

IT IS FURTHER ORDERED Plaintiffs' Motion for Preliminary Injunction in the above-captioned cause is GRANTED.

IT IS FINALLY ORDERED, in accordance with Rule 65(d) of the Federal Rules of Civil Procedure, the Court hereby ENJOINS the Immigration and Naturalization Service (the "INS"):

(1) from stopping and questioning an individual as to his or her right to be or remain in the United States

(2) unless the Agent has a reasonable suspicion, based on specific articulable facts involving more than the mere appearance of the individual being of Hispanic descent,

(3) that the individual is either illegally in the United States or is guilty of committing an offense against the Immigration Laws of the United States for which the INS has jurisdiction.

## AMENDED PRELIMINARY INJUNCTION

BEFORE THIS COURT is Defendants' Motion to Amend Preliminary Injunction in the above-captioned cause. The Court having further considered Plaintiffs' Motion for Preliminary Injunction, Defendants' Motion to Amend, and the Court's December 1, 1992 Preliminary Injunction and accompanying Findings of Fact and Conclusions of Law, hereby enters the following Amended Preliminary Injunction in accordance with Rule 65(d) of the Federal Rules of Civil Procedure:

IT IS ORDERED the Court hereby ENJOINS the El Paso United States Border Patrol Sector, as an agency of the Immigration and Naturalization Service (the "INS"), United States Department of Justice,:

(1) from stopping, detaining, and questioning an individual as to his or her right to be or to remain in the United States

(2) unless the El Paso Border Patrol Agent has a reasonable suspicion, based on specific articulable facts involving more than the mere appearance of the individual being of Hispanic descent,

(3) that the individual is either illegally in the United States or is guilty of committing an offense against the Immigration Laws of the United States for which the INS has jurisdiction.

The Amended Preliminary Injunction does not extend to stops, detentions, and questioning occurring at either the United States Border or one of its undisputed Functional Equivalents regarding other legally authorized law enforcement activity, such as inspections or checkpoint activity, for which reasonable suspicion is not required.

IT IS FURTHER ORDERED the Preliminary Injunction filed by this Court on December 1, 1992 is VACATED.

IT IS FINALLY ORDERED Defendants' Motion to Amend the Preliminary Injunction in the above-captioned cause is GRANTED.